THE ATTORNEY GENERAL *vs.* BOSTON WHARF COMPANY.

A natural creek or channel, within one hundred rods of high water mark, from which the tide never entirely ebbs, limits the right to flats under the colony ordinance of 1647.

The nearest natural creek or channel within one hundred rods of high water mark influences the direction of the division lines between the flats of coterminous estates in a cove; and when such creek or channel is substantially parallel with the shore, the division lines are to be made to it in the most direct course.

An agreement among proprietors of the shore for the division of the flats appurtenant to their estates may be presumed from a long continued series of acts and conveyances by them, recognized by statutes.

The South Boston Association, owning land on the shore of the cove on the northerly side of South Boston, bounded easterly by B Street, within one hundred rods of an ancient

channel from which the tide never entirely ebbed, and claiming to own the flats west of **B** Street in front of their estate to a line one hundred rods from high water mark, conveyed to various persons the easterly part of said land with the flats between lines drawn parallel with B Street, and then conveyed to the Boston Wharf Company all the flats remaining between those first conveyed away and their western boundary. The Boston Wharf Company built a wharf over this channel, and were afterwards authorized by several statutes to maintain their wharf as it then existed, and to extend it beyond one hundred rods below high water mark to a line stated, provided that it should be of no greater width at that line than this court should determine to be the legal width of the flats of the company at one hundred rods from high water mark, and that the wharf company should occupy no flats lying in front of flats or land of other persons or not embraced within the true lines of its estate as they might be determined by this court. *Held,* that the flats were to be divided by lines drawn parallel with B Street and not by lines drawn perpendicular to a line drawn across the base of the cove; that the statute, authorizing the wharf company to maintain their wharf as originally built, granted them the right to fill up the channel; and that their eastern boundary was a line drawn parallel with B Street out to the line to which they were authorized to extend their wharf, as that included no flats in front of flats or lands belonging to others.

INFORMATION in equity, in the nature of a writ of intrusion, filed by the attorney general at the relation of George Odiorne and others, for extending a wharf over flats of the Commonwealth in the cove on the northerly shore of South Boston, filling in the channel and obstructing navigation. The case was submitted to the judgment of the court upon the information, answer and master's report. The defendants, who were incorporated by *St.* 1836, *c.* 259, claimed title under a deed from the South Boston Association, dated May 9th 1836, of " all the flats of said South Boston Association at South Boston, north of First Street, lying between the flats on the west now or formerly belonging to John Winslow and the flats on the east now or formerly belonging to William Sullivan and others, measuring at the south part on First Street eight hundred and twenty one feet or thereabouts, be the same more or less, and running out as far as the said association has a right to go, but without warranty as to the courses of the side lines, but meaning to sell the whole of its flats to the greatest extent said association has a right to them below First Street, and between the flats now or formerly owned as above." The other facts appear in the opinion. The commissioners' and harbor lines referred to are mentioned in *St.* 1853, *c.* 385, § 2. Annexed to the master's report was a plan, the material part of which was as follows:

Attorney General *v.* Boston Wharf Company.

*H. W. Paine,* ( *S. W. Bates* with him,) for the relators.

*R. Choate & H. F. Durant,* ( *A. C. Washburn* with them,) for the defendants.

MERRICK, J.   The questions of law arising in this case are submitted by the parties to the determination of the court upon the report of the master.   Concerning the facts there is now no controversy between them.

The defendants do not deny that they entered upon and occupied the land and flats described in the information in the manner and to the extent therein alleged; but they assert their right to have possession of the premises as owners of the estate under a deed from the South Boston Association, and under sundry grants from the Commonwealth contained in the statutes mentioned and described in the information and answer.

The only issue raised by the pleadings, or which has been suggested by the parties in considering and discussing the matters set forth and stated in the master's report is, whether the defendants are authorized to extend their wharf in the direction and to the extent claimed by them.   It is conceded that they are owners of a portion of the land and flats described in the information, and that this portion is bounded southerly on First Street, and westerly partly on land now or formerly of Winslow and partly on the harbor line on the east side of Fort Point

Channel. In this both parties concur. The defendants claim that their land is bounded on the north by the commissioners' outer line B., and on the east by land formerly of the Boston Glass Manufactory, and by a line running from high water mark one hundred rods parallel with B Street, and from thence, parallel with said harbor line on Fort Point Channel, to said commissioners' line B. On the part of the relators it is insisted that the defendants' land and flats are bounded northerly and easterly by a line running at right angles to a base line extend-ing from headland to headland across the front of the cove upon which their upland is situate. This makes the difference in the claims of the parties. And the real question to be determined is therefore which of these two boundaries is the true boundary of the defendants' land.

The South Boston Association, by a deed to them from William Tudor and others, acquired a title to all the land bordering on the cove between B Street on the east and the land formerly belonging to James Swan on the west, together with all the flats adjacent and belonging to the same, from the upland to the channel or low water mark. This description includes the premises which were afterwards conveyed by them to Winslow and others. As proprietors of the upland, they became entitled, under the colonial ordinance of 1647, to all the adjacent flats to low water mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it ebbs further. Anc. Chart. 148. Having thus a complete title to these flats, they had an un-restricted right to convey them in such parcels, and by such boundaries, as they should think fit. They always claimed all the flats lying in front of the sea wall constructed by them on First Street, which would be comprehended by the line of B Street, extended one hundred rods or to low water mark. Prior to 1836, they conveyed to the South Boston Association and other different parties all the flats lying between B Street and the premises in that year conveyed to the defendants; and in all the deeds the division lines of these several parcels of the flats are described as running parallel with the line of B Street. If therefore the South Boston Association owned the flats to

the full extent of their claim, by their conveyance to the defendants the latter acquired a perfect title to all the flats lying between their undisputed western boundary, and a straight line parallel with B Street from the point where their upland on its eastern side touches high water mark, to the channel or low water mark.

But this claim of the South Boston Association is resisted by the relators, upon the ground that by the true construction of the ordinance of 1647 flats lying within a cove are to be divided between the proprietors of the adjoining upland by parallel lines running at right angles with a base line drawn across it from headland to headland. And in support of this position they rely upon the decision of this court in the case of *Gray* v. *Deluce*, 5 Cush. 9, as an apposite and conclusive authority. It is true that this was held to be, under the facts and circumstances then relied on by the parties and disclosed to the court, the proper and legal mode of dividing between the several owners the flats adjacent to their upland, situate on the margin of the easterly part of this same cove. Nothing was shown to bring the case within any of the rules which had been previously applied and established. The existence of the cove, and of flats lying within it, which were to be divided among proprietors whose uplands were bounded by the curving shore, were the only facts proved or laid before the court as the basis of its decision ; and in the special circumstances of the case, the peculia. and exceptional rule which was adopted seemed to be indispensable to secure to the parties their respective shares, while at the same time the rights of coterminous proprietors to a just equality were recognized and protected.

But that peculiar rule is not applicable to the division of the flats which are involved in the controversy between the parties to the present issue, because here an additional fact of material, and indeed of controlling importance, is satisfactorily established. From time immemorial there has existed a creek or channel from Fort Point Channel, running in front of all the upland of the South Boston Association, and much less than one hundred rods distant from it, and extending many hundred feet easterly of

B Street, in which boats frequently sailed when the tide was at its lowest ebb. This creek therefore formed a limit to the claim of flats by the upland proprietors, beyond which, under the ordinance of 1647, they could set up no title. Upon two successive trials of an action in which this question was involved, the presiding judges severally ruled, that a natural and original creek, in which the tide ebbed and flowed, and from which it did not ebb entirely at the time when from natural causes it ebbed the lowest, would constitute a boundary of the flats, beyond which the demandants were not by law entitled to recover. This ruling was afterwards confirmed and sanctioned by the whole court, as a true exposition of the ordinance, and an accurate statement of the law. And it has since been recognized and applied as a settled and established rule. *Sparhawk* v. *Bullard,* 1 Met 95. *Walker* v. *Boston & Maine Railroad,* 3 Cush. 22.

In stating the opinion of the court in the last named case, it was said by the chief justice, that a creek or channel, which fixes a limit to the claim of flats, must also tend to show the direction in which the division lines are to run when the parts are assigned in severalty to the proprietors among whom they are to be shared. And in general, where there are no circumstances or peculiarities in the formation of the shore or the course of the channel, the lines of division are to be made to the channel in the most direct course from the lateral boundaries of the several tracts of upland to which the flats are appended.

It is not pretended that there are in the present case any peculiarities, in respect either to the creek extending from Fort Point Channel across and in front of a large part of the cove, or to the course of the line of high water mark, which should render the general rule inapplicable to the division of these flats; and from inspection of the plan accompanying the master's report it is obvious that there are none. The division therefore of these flats is to be governed by the general rule. And adopting and applying that rule the conclusion is plain and inevitable. The upland of the South Boston Association being bounded on the east by the centre of B Street, the line of that street continued straight and direct to the creek constitutes and defines

the eastern boundary of the flats owned by the defendants. This fully maintains the claims which they have in this respect asserted.

The right of the defendants to the flats between high water mark and the channel in front of it, and as far to the east as a iine extended from the northwest corner of their upland parallel with B Street, as asserted by them in their answer, being thus shown, it is scarcely necessary to consider their further position that the location of the flats appurtenant to the upland on the shore between Turnpike and Dorchester Streets has been settled by the action of so large a number of the upland proprietors as to create a legal presumption that the lines have been settled and fixed by some obligatory contract entered into in pursuance of the mutual consent and agreement of them all. And yet the evidence upon this point is so full, explicit, uncontradicted, and all tending to the same result, that it should not be wholly over-looked or disregarded.

In March 1804 that part of the territory of the town of Dorchester which was afterwards called South Boston, was by an act of the legislature annexed to the then town of Boston. *St.* 1803, *c.* 111. It is sufficiently obvious from its provisions that this statute was enacted in anticipation that the land thus annexed would subsequently become an important portion of the metropolis, and be likely to be thereby rendered of greatly enhanced value. All the arrangements in relation to it were evidently made on this expectation. Streets were to be laid out by the selectmen through and over the whole tract, such as in their judgment would be for the common benefit of the town and of the proprietors of the land, in doing which reasonable attention was to be paid to the wishes of the latter. And in executing their duties under these provisions, the selectmen of Boston, in February 1805, after several meetings with the proprietors, proceeded to lay out and establish public streets through and over all parts of the annexed territory, according to an exact and carefully matured system, which had been mutually agreed upon by the parties. All these streets were laid out at right angles with each other; and those which extended

to the sea were to be considered as continuing in the same direction upon and over the flats as far as the owners of the upland through which they were located could claim any title thereto. *Henshaw* v. *Hunting*, 1 Gray, 202.

Having by these public arrangements secured to themselves the advantages which would result from the adoption of a uniform and judicious system in the location of common highways over all their upland, it would be perfectly natural, and almost inevitable, that the proprietors should endeavor to avail themselves of it in the division among themselves of the adjacent flats ; a matter which from the beginning has always been found to be, without the aid of mutual concession and agreements, attended with many practical difficulties. *Rust* v. *Boston Mill Corporation*, 6 Pick. 169. And accordingly it is a fact, as stated in the report of the master, that the South Boston Association have constantly claimed all the flats lying in front of their upland, up to the line of B Street extended to low water mark ; and in all their various deeds of conveyance they have made the boundary of the several lots of flats conveyed to be parallel with that line. It also appears that on the opposite side of B Street and from thence easterly to Dorchester Street the whole of the flats has been divided to low water mark in the same way by division lines parallel to each other and parallel also to B Street. This uniformity in their claims, and this common recognition of lines, all running in, over and along the same course and direction, as the boundaries of their several shares in the flats, by the numerous proprietors of estates bordering on this extended shore, not only indicate a common understanding among them, in relation to their respective rights, but also have a manifest tendency to prove that they entered into stipulations with each other on the subject and became bound by the provisions of some obligatory contract. *Adams* v. *Boston Wharf*, 10 Gray, 521.

But it seems unnecessary further to pursue the examination and discussion of this question, since it clearly appears that upon the well settled rules of law in relation to this subject, the defendants have, under their deed from the South Boston Associa-

tion, a good title to all the flats in front of their upland, as far northerly as the creek running east from Fort Point Channel and as far easterly as the lands formerly of the Boston Glass Company and there bounded by a line parallel with B Street.

But although the defendants were not lawfully entitled, under the ordinance of 1647, to any of the flats adjacent to their upland beyond the creek last mentioned, yet through some misapprehension, which appears to have been entertained by them in common with all the proprietors of lands lying between Dorchester and Turnpike Streets, they did in fact claim to be owners of the whole flats to a line one hundred rods distant from the line of high water, bounding the entire distance on the east by a line parallel with the line of B Street extended. And in the exercise of that asserted right, they proceeded after their purchase in 1836, and before the year 1844, to construct, in the course and direction of the last named line, a solid wharf with stone sea walls across the creek from Fort Point Channel, by which that creek was wholly obstructed and shut up. Some parts of this wharf, as it was then constructed, extended within less than two hundred feet of the line one hundred rods below high water mark. While they were thus in the undisturbed possession of a portion of the flats below the creek, doing acts and exercising rights as owners under the claim of title down to the hundred rod line, they were expressly authorized by the *St.* of 1845, *c.* 239, to maintain their wharf as it then existed, and to extend it northerly fourteen hundred feet from and beyond the angle in the harbor line on Fort Point Channel, and from thence easterly to the easterly line of their wharf continued to a like distance; provided that in this extension they should not pass over any intermediate creek or channel. But subsequently to the passage of that act a short creek or channel having been found crossing the flats in some places at the distance of only one hundred rods from the line of high water, they did not derive all the advantages they had expected from that grant, but that creek became for the time being the northerly bound of the flats conveyed to them by it. At a later day this proviso was annulled; and by the *Sts.* of 1850, *c.* 246; 1852, *c.* 171; 1854, *c.* 218, and 1855, *c.* 455, the right

to maintain their wharf as it had been constructed was recog-
nized and confirmed, and further and additional powers were
conferred upon them. By the last mentioned statute, which
substantially renewed and confirmed all the grants which had
previously been made, the defendants were' invested with fur-
ther privileges, and acquired title to an additional portion of the
flats. .They were thereby authorized to extend their wharf from
the line of private rights at one hundred rods distant from high
water mark, of the same width as the length of that line, which
was to be thereafter judicially ascertained and determined by this
court, to the commissioners' line B. But they were to take and
hold no land or flats by virtue of its provisions, which would not
be embraced within the true lines of their own estate as they
should be defined by this court, or which should lie in front of
the land or flats of any other person.

The effect of this statute is so plain and obvious that it can-
not be mistaken. In the first place it recognizes and confirms
the right of the defendants, under their deed from the South
Boston Association and former grants from the Commonwealth,
to the flats between high water mark and a line one hundred
rods distant from it, leaving the place or position of that line, as
the boundary of their estate at that point, to future judicial de-
termination. In the next place, it granted and conveyed to them
all the flats, below and northerly of the last named line, and of
the same width as its length, to the commissioners' line B, which
were not in front of the land or flats of any other person. The
questions in relation to these matters being first disposed of, the
extent of the grant, and the boundaries of the territory or tract
of flats owned by the defendants, including what was then ac-
quired, can be at once, and accurately, ascertained.

The defendants' estate is acknowledged by the relators to be
bounded on the south by First Street, and on the west by the
harbor line on Fort Point Channel. No controversy has ever
existed in relation to either of these boundaries. And it has
been already shown, that on the east it is bounded by a line
running parallel with B Street, from a point where the eastern
boundary of their upland comes to high water mark, to the first

creek found in front of it. From this last point the same line of boundary is, by force of the provisions of the statutes of 1845 and 1850 above referred to, extended in the same direction, that is, parallel with B Street, to the line one hundred rods below high water mark. From this point to the harbor line on Fort Point Channel, measuring at right angles with it, the distance is twelve hundred and fifty feet, and therefore the width of the parcel of flats thus granted to the defendants northerly of this point is twelve hundred and fifty feet all the way to the commissioners' line B, and is bounded on the east by a line parallel with the harbor line on Fort Point Channel.

From this it appears that the defendants are the owners of, and have good title to, all the lands and flats included within these boundaries, unless some portion of the flats there granted is situate in front of the lands or flats belonging to other persons. And it certainly is not, so far as appears from the facts stated in the report of the master, upon which alone the judgment of the court must here be rendered. The ancient creek from Fort Point Channel extends easterly, as is shown on the plan, at least as far as D Street ; and therefore the proprietors of upland lying west of that point cannot, under the ordinance of 1647, claim any flats beyond the creek. It does not appear that any grants have ever been made to them of any flats lying north of it. And as to the tracts of upland lying east of D Street, even if the adjacent flats were to be divided according to the rule established in *Gray* v. *Deluce*, by running lines at right angles to a base line across the front of the cove, no such line of division, if it were to be extended in the same direction to the commissioners' line B, would come within many hundred feet of the defendants' above described eastern boundary on that line. So that it fully and clearly appears that the flats granted to them by the statute of 1855 were not situate and did not lie in front of the land or flats of any other person, and consequently that their right and title to the territories is unqualified and perfect.

It was suggested by the relators that the defendants could not avail themselves of the provisions of the several statutes

referred to, and particularly that of 1845, because they had, before its passage, by the construction of their wharf wholly filled up a portion of the creek extending from Fort Point Channel, when it was expressly declared in their act of incorporation that no authority was thereby given them to obstruct or encroach upon any channel or to infringe upon any of the rights of the Commonwealth. It is no doubt true that, in the view we have taken of the rights of the parties, the defendants did act without authority and in violation of law in the construction of their wharf. But it is not pretended that they were guilty of any fraud, misrepresentation or concealment of what they had done; and there is no proof that their acts were not perfectly well known to the legislature and to the public officers whose peculiar duty it was to protect in these matters the rights of the Commonwealth. It may have been and probably was thought that the proceedings of the defendants in carrying out and completing the work in which they were engaged would prove beneficial to some leading interests in the State, add facilities to persons engaged in navigation and commerce, and be in other respects promotive of the public welfare. At any rate the statutes were duly enacted, and no fraud or imposition having been practised in procuring the grants under them, the Commonwealth is estopped to deny their validity. *Commonwealth* v. *Pejepscot Proprietors,* 10 Mass. 155.

It was intimated, rather than insisted upon, by the defendants at the argument, that they were entitled under their last grant to take and have flats of the width of the distance between the two points in the lateral boundaries of the premises claimed by them where they would be intersected by a curved line one hundred rods from high water mark. That certainly is incorrect. Their estates were of no such width at either of the two points; and there is nothing to show any intention to increase the width of the flats below by measuring diagonally across the estate above. It is fixed by measuring in the most direct course from one side to the other at a point one hundred rods below high water mark. The report shows that distance to be twelve hundred and fifty feet.

The rights of the defendants asserted in their answer having been established, the information filed against them cannot be maintained, and must accordingly be dismissed.

*Decree accordingly.*